(No. 61281.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. PATRICK WILLIAMS, Appellant.

*Opinion filed December 20, 1985.*

328

Theodore A. Gottfried, State Appellate Defender, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Jill-Wine Banks, Solicitor General, and Mark L. Rotert and James V. Cinotto, Assistant Attorneys General, of counsel), for the People.

JUSTICE MORAN delivered the opinion of the court:

The defendant, Patrick Williams, was charged by information in the circuit court of Jackson County with the offenses of murder (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(a)(1), 9—1(a)(2)) and theft (Ill. Rev. Stat. 1981, ch. 38,

par. 16–1). Prior to trial on the murder charge, defendant pleaded guilty to the offense of theft. Thereafter, following a jury trial, defendant was found guilty of murder. He was sentenced to concurrent terms of 25 years' imprisonment for murder and 5 years' imprisonment for theft. A codefendant, Edward Leroy Buchannan, entered into a negotiated plea agreement, wherein he pleaded guilty to murder and was sentenced to 20 years' imprisonment.

Defendant appealed his conviction, contending that the trial court, in refusing to admit audio tape-recorded statements into evidence, violated his constitutional right to due process. A majority of the appellate court, under Supreme Court Rule 23 (87 Ill. 2d R. 23), affirmed the defendant's conviction (129 Ill. App. 3d 1168). We allowed defendant's petition for leave to appeal (87 Ill. 2d R. 315).

The single issue before this court is whether the trial court committed reversible error when it denied the defendant the opportunity to play the two audio tape-recorded statements before the jury.

Evidence adduced at trial reveals the following information. A police officer employed by the city of Carbondale testified that on September 10, 1982, he was dispatched to an apartment complex to check on the welfare of Benjamin Dockins. A concerned individual from Dockins' place of employment had called the police department when he failed to report for work. The owner of the apartment complex admitted the police officer into Dockins' apartment, where he immediately observed the body of Benjamin Dockins lying on the couch in the living room. Because the victim was nude, with the exception of a towel wrap covering the groin area, the officer observed lividity in the victim's back and feet and concluded that he was dead. The officer phoned his supervisor for assistance.

After determining that the victim's car was missing, the Carbondale police had the vehicle entered into the computer at the National Crime Institute as a stolen vehicle. The testimony of a police officer from Crete, Illinois, indicates that he observed this automobile early in the evening of September 10, 1982. A chase ensued which ended in a three-car collision. The driver, Buchannan, was apprehended at the scene of the accident. The defendant fled the scene but was arrested by other Crete police officers shortly thereafter.

Two Carbondale police officers, Sergeant Tim Moss and Sergeant Don Strohm, drove to Crete when they were notified of these events. They arrived early in the morning of September 11, 1982. After viewing items of personal property recovered by the Crete police officers, the Carbondale officers interviewed the defendant and Buchannan in the Crete police department. Defendant was interviewed a second time by the same officers on September 14, 1982, during a car ride from the Will County jail to the Jackson County jail. Both interviews were tape-recorded. Officers Moss and Strohm each testified at trial regarding these statements.

The testimony of both officers details the events of September 9 through 11, as related to them by the defendant. Their testimony reveals that on the evening of September 9, 1982, the defendant met his friend, Buchannan, at a bar in Carbondale. Buchannan suggested that they go to the apartment of the victim "to get high." Buchannan had been there the prior evening after meeting the victim at the same Carbondale bar. Defendant and Buchannan went to the victim's apartment, where they were admitted by the victim. All three consumed liquor, smoked marijuana and inhaled a substance referred to as "locker-room."

During the initial interview, defendant indicated that, at one point in the evening, the victim went into the

bathroom to shower. During that time, the defendant stated that he stole a gold necklace which belonged to the victim. Following the shower, the victim and Buchannan began arguing. This argument culminated with Buchannan inflicting a "karate chop" on the victim's neck and upper back area, at which point he collapsed, unconscious, onto the floor. Defendant denied during this interview that he ever struck the victim.

In the September 14 interview, the defendant revealed that the victim had been making repeated homosexual advances toward him which he consistently rebuffed. When the victim persisted, the defendant hit him once on the arm and once in the chest area. Defendant indicated that these blows were inflicted with more of an open-hand kind of hit than a closed fist. During this period, Buchannan grabbed the victim from behind and began choking him. The victim collapsed and was placed on the living room couch. In this interview defendant admitted removing the gold necklace from the victim's neck after he was placed on the couch.

The defendant and Buchannan collected different items from the victim's apartment which they placed in the victim's car. Defendant began walking home when Buchannan picked him up in the victim's car. After retrieving some clothing at his residence, the defendant and Buchannan drove to the home of the defendant's father in Chicago Heights, Illinois. There they met with a friend of the family who accompanied them to a jewelry store where they sold several items of jewelry they had stolen from the victim's apartment. Defendant and Buchannan were in that area when they became involved in the accident which eventually led to their arrest.

A pathologist testified that three sets of injuries contributed to the death of the victim. There were compression injuries to the larynx as evidence of strangulation, five rib fractures, one of which punctured the lung, caus-

ing partial collapse of that organ, and, finally, laceration of the spleen with hemorrhaging into the abdomen. The pathologist also stated that the nature of the rib fractures and the lacerated spleen indicated multiple blunt trauma such as would be inflicted by a hand or fist striking the body with great force. In addition, because of the depth of some of the soft-tissue injuries, the pathologist observed that they were typical of injuries caused by kicking or stomping.

Defendant called Officer Strohm as a witness at the beginning of his case to lay a foundation for playing the tape-recorded statements before the jurors. The State objected to the defendant's request. The trial judge did not allow the defendant to introduce this evidence, finding that the playing of the tapes would be cumulative and possibly confusing to the jurors, who had already heard the testimony of the police officers regarding the taped interviews. The court also concluded that there was no evidence to show that the recording was properly preserved and would not allow the defense to call the Carbondale police evidence custodian, nor would it grant an hour-and-a-half continuance so that Officer Strohm could listen to the tapes to verify their accuracy. The tapes were allowed into the record as an offer of proof.

In affirming the judgment of the circuit court, a majority of the appellate court found that the failure to allow the tapes to be played before the jury was not prejudicial. The court concluded that the jury was made aware of every detail of the statements through the lengthy direct examination and cross-examination of each officer. The defendant argues that the opinion of the majority of the appellate court denies him his constitutional right to present evidence and is inconsistent with this court's opinion in *People v. Weaver* (1982), 92 Ill. 2d 545.

The criminal defendant's right to due process is es-

sentially "the right to a fair opportunity to defend against the State's accusations." (*Chambers v. Mississippi* (1973), 410 U.S. 284, 294, 35 L. Ed. 2d 297, 308, 93 S. Ct. 1038, 1045.) Intrinsic to this constitutional guarantee are the rights to cross-examine and to present evidence. (U.S. Const. amend. V; Ill. Const. 1970, art. I, sec. 2.) Defendant, in the instant case, contends that he was deprived of these basic rights when the trial court refused to play before the jury the recorded statements he had made to the police. This argument is grounded in the general evidentiary principle that "if one party introduces part of an utterance or writing the opposing party may introduce the remainder or so much thereof as is required to place that part originally offered in proper context so that a correct and true meaning is conveyed to the jury." *Lawson v. G. D. Searle & Co.* (1976), 64 Ill. 2d 543, 556. See McCormick, Evidence sec. 56 (3d ed. 1984); Cleary & Graham, Illinois Evidence secs. 106.1, 106.2 (3d ed. 1979); 2 Gard, Illinois Evidence, Rule 15:31 (1979); 4 Callaghan's Illinois Evidence secs. 5.25, 5.26 (1964); 29 Am. Jur. 2d *Evidence* secs. 535, 599 (1967); see also Fed. R. Evid. 106.

To comply with this "rule of completeness," the trial court should have allowed all that the defendant said, which pertained to the events at issue, to be placed before the jury through cross-examination of the officers or through defendant's own witnesses. Defense counsel, utilizing a transcript of the tapes, did extensively cross-examine the officers and examine both Buchannan and defendant. He was not precluded from bringing out any aspect of the conversation. The inquiry then becomes whether, under the facts of this case, the trial court should have allowed the defendant to play the tapes before the jury.

In *People v. Weaver* (1982), 92 Ill. 2d 545, the defendant had been convicted of the murder of her husband. At

trial, the State was allowed to elicit, from the defendant's neighbor, selected unrecorded verbal statements made by the defendant. Specifically, the witness testified that the defendant ran to her house in panic stating that there were two men in her house with guns. However, because the State had successfully moved to exclude, as hearsay, further details of what the defendant had said about the two men, the defense was unable to bring out the entire content of defendant's statements made to the witness. Citing *People v. Nakutin* (1936), 364 Ill. 563, 571, *Weaver* stated that "where a conversation is related by a witness the opposing party has a right to bring out all of the conversation on cross-examination." 92 Ill. 2d 545, 556.

*Weaver*, moreover, makes it clear that the right to bring out all of a conversation is not absolute, but depends upon the *relevancy* of the additional parts of the conversation the party wishes to introduce. There the restriction of cross-examination was prejudicial because further details about the conversation could have affected the jury's belief as to the defendant's truthfulness during the conversation. 92 Ill. 2d 545, 556-57.

In the instant case, defense counsel was not restricted in his cross-examination of Officers Moss and Strohm. In fact, utilizing a transcript of the tapes, he extensively cross-examined both officers. However, we do not believe that a defendant is limited in his right to oral cross-examination regarding a conversation. When one party offers oral testimony regarding a conversation, a tape recording of that conversation may have independent relevance. Demonstrative evidence may be clearer and more persuasive than oral testimony covering exactly the same points, and thus this court has allowed the jury to view photographs of a crime victim even when witnesses have orally detailed the victim's condition. (*People v. Henenberg* (1973), 55 Ill. 2d 5, 13-14.)

Similarly, the appellate court has allowed electronically recorded evidence to be played for the jury despite the introduction of identical oral testimony. *People v. Robinson* (1982), 104 Ill. App. 3d 20, 26-27; *People v. Nahas* (1973), 9 Ill. App. 3d 570, 578.

The State argued that inferences from the defendant's statements suggested that he was partially responsible or accountable for the victim's death. Defendant maintains that playing the tapes would reveal that he did not cause any of the blunt trauma to the victim's body and that Buchannan inflicted the fatal injuries. Defendant refers to three instances where the testimony given by Officer Moss, during direct examination, mischaracterized his actual statements.

We have carefully scrutinized the entire record in this cause, giving special attention to the two taped statements. Our review of the trial transcript did reveal inconsistencies between the testimony of the two officers. Further, there were several occasions, on cross-examination, that Officer Moss could not remember or was unsure of statements made by the defendant.

We need not, however, decide whether these inconsistencies themselves entitled defendant to play the tapes to the jury, because the State's case did not depend solely upon the interpretation of defendant's actual statements. The State's primary position at trial was that critical parts of the statements were untrue. The prosecutor pointed out the inconsistencies between defendant's first and second statements, and argued that the inconsistencies demonstrate that defendant was lying when he gave the statements. In closing argument the prosecutor disputed the version of events related in the statements. The prosecutor argued that defendant could not have been surprised and frightened by the victim's homosexual advances because defendant was himself a homosexual. (The State, in fact, presented a witness, an

oft-convicted felon, who claimed to have had homosexual relations with the defendant 25 to 30 times.) Moreover, while defendant claimed that he removed items from Dockins' apartment due to his panic and threats from Buchannan, the prosecutor argued that the defendant had intended a robbery from the start. The defendant, the prosecutor argued, had not been panicked or grief stricken when the victim collapsed, but instead had been aware, before he even entered the apartment, that the robbery might result in Dockins' death. Since the veracity of the statements was clearly in issue, the defendant's demeanor and voice inflections, as recorded on the tapes, was relevant wholly independent of the actual words spoken.

Other jurisdictions, it appears, are split on the general issue involved here. Some jurisdictions consider the testimony of a witness to a conversation to be an adequate substitute for the playing of a tape recording. (See, *e.g.*, *Turner v. State* (1969), 45 Ala. App. 419, 231 So. 2d 341; *Eaton v. State* (Del. 1978), 394 A.2d 217.) Other jurisdictions disagree, holding that refusal of a relevant tape recording is not remedied by allowing the testimony of witnesses to the recorded statements. (See, *e.g.*, *Bentley v. State* (Alaska 1965), 397 P.2d 976; *People v. Harding* (1974), 44 A.D.2d 800, 355 N.Y.S.2d 394; *Commonwealth v. Henderson* (1979), 483 Pa. 345, 396 A.2d 1202.) Under the circumstances of this case we agree with the latter view. The part of the statements excluded from evidence—the defendant's demeanor and voice inflections at the time of the statement—could have affected the jury's assessment as to the credibility of the statements. The tapes could also have affected the jury's assessment of defendant's credibility at trial where he explained that he was untruthful when he made the first statement because he was upset, tired, and frightened. It was therefore error to summarily

refuse to let the defendant play the tape for the jury.

The admission of the tape, however, is still subject to defendant establishing an adequate foundation. The defendant has no obligation to affirmatively establish a chain of custody and the absence of tampering where, as here, the tape has been in the exclusive control of the State. The obligation to demonstrate the presence or absence of tampering rests with a party exerting exclusive control over a tape recording. Moreover, an adequate foundation is established when a witness to the conversation recorded on the tape—in this case either of the two officers or the defendant—testifies that the tape, as it exists in court, accurately portrays the conversation in question. *United States v. Buzzard* (10th Cir. 1976), 540 F. 2d 1383, 1386; *People v. McCommon* (1979), 79 Ill. App. 3d 853, 867; *People v. Spicer* (1978), 61 Ill. App. 3d 748, 758, *rev'd on other grounds* (1979), 79 Ill. 2d 173.

The defendant offered to have Officer Strohm listen to the tapes and determine whether the tapes accurately portray the defendant's statements. This offer was sufficient to preserve the issue, even though the better procedure might have been to play the tape for the foundation witness immediately prior to trial. Because the trial court did not let defendant continue with the complete offer of proof we cannot determine whether or not an adequate foundation would have been laid, but the trial court's failure to allow the defendant to *attempt* a foundation warrants a new trial. Therefore, the judgments of the appellate and circuit courts are reversed, and the cause is remanded to the circuit court of Jackson County for a new trial consistent with this opinion.

*Reversed and remanded.*